UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.

GUSTAVO ADOLFO YABRUDI

CASE NO. 8:18-cr-411-T-36 AEP
18 U.S.C. § 1956(h)

**INFORMATION**   *SEALED*

The United States Attorney charges:

**COUNT ONE**
**(Conspiracy to Commit Money Laundering – 18 U.S.C. § 1956(h))**

A.   **Introduction**

At times material to this Information:

<u>Trade-Based Money Laundering and the Black-Market Peso Exchange</u>

1.   Foreign drug-traffickers responsible for the importation and sale of illegal drugs in the United States accumulate large stockpiles of cash, denominated in United States dollars ("dollars"), constituting proceeds of illegal drug sales. These foreign drug-traffickers seek ways to repatriate the funds to their home countries and convert them into their home-country currencies while laundering the funds through banking and other transactions to conceal the funds' illicit origins. Some of these drug-traffickers live in Colombia and thus seek to repatriate the drug proceeds to that country,

converting them into Colombian pesos ("pesos"), the national currency of Colombia.

2. One of the ways by which these Colombian drug-traffickers frequently launder, repatriate, and convert their illicit drug proceeds from dollars in the United States to pesos in Colombia is by way of trade-based money laundering ("TBML") schemes. In a conventional TBML scheme, dollar-denominated cash proceeds of illegal drug sales are deposited into U.S.-based bank accounts, transforming the illicit cash into bank deposits. Money launderers then use these deposited funds to purchase goods in the United States that they export to Colombia, where they sell the goods in exchange for pesos. The pesos are then distributed to the drug-traffickers and their associates in Colombia to complete the laundering, repatriation, and conversion process.

3. Another means by which Colombian drug-traffickers launder drug proceeds from the United States back to Colombia is the black-market peso exchange ("BMPE"). Here, drug-traffickers and their associates deposit dollars from illegal drug sales in the United States into U.S. bank accounts to transform the illicit cash into bank deposits. Then, money brokers and their associates in the United States purchase these deposited funds while quickly arranging for a payout of pesos to the drug-traffickers and their

associates in Colombia—so-called "mirror" payments. The brokers make a profit based on the conversion rate that they charge for the BMPE transactions. Despite the brokers' profits, drug-traffickers find the BMPE appealing because it usually offers an exchange rate less than that offered through official banking channels and avoids the potential scrutiny of moving large amounts of drug proceeds through the banks.

4. Recently, Colombian drug-traffickers have begun using a hybrid TBML/BMPE scheme that employs both types of money-laundering vehicles. In this scheme, drug-traffickers deposit dollars from illegal drug sales in the United States into U.S.-based bank accounts. Brokers purchase these deposited funds and take responsibility for laundering, repatriating, and converting the funds for payment to the drug-traffickers in Colombia.

5. In the BMPE portion of the hybrid scheme, the brokers quickly arrange for peso-denominated mirror payments by Colombian money brokers, who direct pesos to the traffickers and their associates in Colombia. In doing so, the U.S. money brokers often incur peso-denominated debts in Colombia to their Colombian money-broker counterparts that must be repaid.

6. Meanwhile, the U.S. brokers lend the dollar-denominated funds that they have purchased to exporters in the United States to execute the TBML portion of the hybrid scheme. The exporters then use the U.S.-based

3

funds to purchase goods that they export to Colombia and sell in exchange for pesos. Once the exporters receive the pesos, they repay the U.S. brokers who lent them the dollars, often by making peso-denominated payments to the Colombian who had lent pesos to complete the mirror payments involved in the BMPE portion of the hybrid scheme. The brokers make money both on the exchange rate offered through the BMPE transactions and by charging interest to the exporters engaged in TBML.

### The Individuals

7. GUSTAVO ADOLFO YABRUDI ("YABRUDI") was a citizen of Venezuela and a resident of Miami-Dade County, Florida.

8. Coconspirator-1 was a citizen of Colombia and a resident of Miami-Dade County, Florida, who owned Company-A, an export business described below.

9. Coconspirator-2 was a citizen of Colombia and a resident of Marion County, Florida, which is located within the Middle District of Florida.

10. Coconspirator-3 was a resident of Miami-Dade County, Florida, and Colombia who worked as a Special Agent for the United States Drug Enforcement Administration ("DEA").

11. Coconspirator-4 was a citizen of Colombia and a resident of Miami-Dade County, Florida.

The Entities

12. Company-A was a company incorporated under Florida law with the Florida Department of State, Division of Corporations. Company-A was controlled by Coconspirator-1 and operated in Miami-Dade County, Florida, and elsewhere. Among other things, Company-A was in the business of shipping cellular telephones from Florida to Colombia.

13. Company-B was a company incorporated under Florida law with the Florida Department of State, Division of Corporations, in Orange County, Florida, located within the Middle District of Florida. Company-B was controlled by Coconspirator-2.

14. Company-C was a shell company controlled by the DEA for the purpose of, among other things, conducting undercover money-laundering operations. The intended purpose of these operations was to identify individuals involved in the laundering of illicit drug proceeds both within the United States and internationally. Company-C held accounts located in, among other places, Hillsborough County, Florida, which is located within the Middle District of Florida.

### B. The Conspiracy

15. Beginning on an unknown date, but at least as early as in or around August 2011, and continuing through and including at least in or around May 2017, in the Middle District of Florida and elsewhere, the defendant,

GUSTAVO ADOLFO YABRUDI,

did knowingly and willfully combine, conspire, and agree with Coconspirator-1, Coconspirator-2, Coconspirator-3, Coconspirator-4, and other persons, both known and unknown to the United States Attorney, to commit offenses against the United States, in violation of 18 U.S.C. § 1956, that is:

    a. to transport, transmit, and transfer monetary instruments and funds from a place in the United States to a place outside the United States with the intent to promote the carrying on of a specified unlawful activity, that is, the unlawful distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1), in violation of 18 U.S.C. § 1956(a)(2)(A); and

    b. to transport, transmit, and transfer monetary instruments and funds from a place in the United States to a place outside the United States, knowing that said monetary instruments and funds represent the proceeds of some form of unlawful activity and knowing that such

transportation, transmission, and transfer is designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of a specified unlawful activity, that is, the unlawful distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1), in violation of 18 U.S.C. § 1956(a)(2)(B)(i).

### C. Manner and Means

16. The manner and means by which the conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

17. It was a part of the conspiracy that conspirators would and did launder cash proceeds of illegal drug sales in the United States from drugs imported into the United States from Colombia, repatriating those proceeds to the drug-traffickers in Colombia and converting those proceeds from dollars to pesos by way of a hybrid TBML/BMPE laundering scheme;

18. It was further part of the conspiracy that conspirators would and did execute the hybrid TBML/BMPE scheme in at least two ways, the first of which involved the following steps, among others:

   a. conspirators, including YABRUDI and Coconspirator-3, would and did open, and cause to be opened, bank accounts for the purpose of laundering illegal drug proceeds, including in the Middle

7

District of Florida;

        b.     conspirators and others acting at the direction of conspirators, including YABRUDI and Coconspirator-3, would and did deposit dollar-denominated proceeds of illegal drug sales in the United States into these accounts, thereby converting cash proceeds of illegal drug sales into dollar-denominated bank deposits;

        c.     conspirators, including YABRUDI and Coconspirator-3, would and did transfer, and cause to be transferred, these deposited funds to other accounts in the United States, including the Company-B account controlled by Coconspirator-2, located within the Middle District of Florida;

        d.     conspirators, including YABRUDI and Coconspirator-4, would and did act as wire facilitators, directing dollar-denominated drug proceeds to brokers for the purpose of laundering, repatriating, and converting the deposited funds to pesos;

        e.     conspirators, including YABRUDI and Coconspirator-2, would and did act as brokers and arrange for mirror payments of pesos to be made to drug-traffickers and their associates in Colombia by way of the BMPE;

        f.     meanwhile, conspirators, including YABRUDI,

also would and did loan funds to export businesses, including Coconspirator-1's Company-A, which used those funds to purchase goods for export to Colombia as part of the TBML portion of the scheme;

g. conspirators would and did cause those exported goods to be sold in Colombia in exchange for pesos, which were used to repay those persons who had loaned funds for the export of goods to Colombia in the TBML portion of the scheme, including YABRUDI;

19. It was also part of the conspiracy that conspirators would and did obtain illegal drug proceeds held in DEA undercover accounts, which conspirators would and did use to further the TBML/BMPE scheme by way of the following steps, among others:

a. bulk deposits of dollars constituting illegal drug proceeds were deposited into DEA undercover accounts, including accounts held by Company-C in the Middle District of Florida;

b. conspirators, including YABRUDI, would and did purchase dollar-denominated funds held in DEA undercover accounts, including accounts held by Company-C in the Middle District of Florida;

c. conspirators, including YABRUDI, would and did arrange for peso-denominated mirror payments to drug-traffickers and their associates in Colombia by way of the BMPE;

      d. conspirators, including YABRUDI, would and did arrange to loan dollar-denominated funds that had been held in DEA undercover accounts to export businesses, including Coconspirator-1's Company A, for use in the TBML portion of the scheme;

      e. conspirators, including Coconspirator-1, would and did use the dollar-denominated funds to purchase goods for export to Colombia;

      f. conspirators, including Coconspirator-1, caused these exported goods to be sold in Colombia in exchange for pesos;

      g. conspirators, including Coconspirator-1, used the pesos to, among other things, repay those who had lent them dollar-denominated funds in the TBML portion of the scheme, including YABRUDI;

   20. It was further part of the conspiracy that Coconspirator-3 provided conspirators, including YABRUDI and Coconspirator-4, access to funds contained in undercover DEA accounts, including accounts of Company-C located in the Middle District of Florida;

   21. It was further part of the conspiracy that conspirators, including YABRUDI and Coconspirator-4, would and did pay kickbacks to Coconspirator-3 to maintain access to the DEA undercover accounts;

22. It was further part of the conspiracy that conspirators, including YABRUDI, profited from the hybrid TBML/BMPE scheme by exploiting the dollar/peso exchange rate applied to the BMPE transactions and/or by charging interest on the loans provided in the TBML portion of the scheme; and

23. It was further part of the conspiracy that conspirators would and did perform acts and make statements to misrepresent, hide, and conceal, and cause to be misrepresented, hidden, and concealed, the purpose of the conspiracy and the acts committed in furtherance thereof.

All in violation of 18 U.S.C. § 1956(h).

## **FORFEITURE**

1. The allegations contained in Count One of this Information are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to the provisions of 18 U.S.C. § 982(a)(1).

2. From his engagement in any or all of the violations alleged in Count One, the defendant,

GUSTAVO ADOLFO YABRUDI,

shall forfeit to the United States of America, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in such offense and any property traceable to such property.

3. The assets to be forfeited specifically include, but are not limited to, a judgment in the amount that was involved in the offense.

4. If any of the forfeitable assets described above, as a result of any act or omission of the defendant:

    (a) cannot be located upon the exercise of due diligence;

    (b) has been transferred or sold to, or deposited with, a third person;

    (c) has been placed beyond the jurisdiction of the Court;

    (d) has been substantially diminished in value; or

    (e) has been commingled with other property which cannot be subdivided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property under the provisions of 21 U.S.C. §853(p), as incorporated by 18 U.S.C. § 982(b)(1).

BYUNG J. PAK  
United States Attorney  
Northern District of Georgia

By: /s/ James Mandolfo  
James Mandolfo  
Assistant United States Attorney

By: /s/ Stacie B. Harris  
Stacie B. Harris  
Assistant United States Attorney  
Chief, Special Victims Section