**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

**Case No. 18-cr-411-T-36AEP**

**UNITED STATES OF AMERICA**

v.

**GUSTAVO ADOLFO YABRUDI,**

Defendant.

_____ /

## DEFENDANT'S MOTION FOR DOWNWARD VARIANCE AT SENTENCING AND INCORPORATED MEMORANDUM OF LAW

COMES NOW, the Defendant, GUSTAVO ADOLFO YABRUDI, by and through undersigned counsel and pursuant to Fed. R. Crim. P. 32, respectfully requests a downward variance under the factors set forth in § 3553(a).

## I.     INTRODUCTION

In support of this request, Yabrudi submits the following which, when considered along with Yabrudi's Sentencing Memorandum, demonstrates that Yabrudi's offense and case is not adequately considered by the formulaic application of the Sentencing Guideline and the "loss" table. The Sentencing Commission crafted the guideline and loss table simply as a matter of "policy," without any empirical analysis to support it. Lost in the inherently unreliable numbers is Yabrudi' otherwise spotless record and service he provided the United States Government as a confidential informant, his low risk of recidivism, the collateral consequences he has already suffered as a result of his case, the uniqueness of this case, and the unnecessary disruption that additional time behind bars would create to Yabrudi and his family.

1

For all of these reasons, the Court should base Yabrudi's sentence on a careful analysis of all the § 3553(a) factors which, together, establish that the sentence that is "sufficient, but not greater than necessary," to achieve the goals of sentencing as required by § 3553(a)(2) is a sentence which does not involve additional imprisonment.

## MEMORANDUM

### I.     The Statutory Scheme

As the Court knows, the Sentencing Guidelines are no longer mandatory and are not even presumed to be reasonable; they are just one of many factors to be weighed when selecting a disposition that is sufficient but not greater than necessary to satisfy the purposes and goals set forth in § 3553(a). *Gall v. United States*, 552 U.S. 38, 49-50 (2007). Under *Gall*, the advisory Guideline range does not have "any particular weight." *United States v. Irey*, 612 F.3d 1160, 1217 (11th Cir. 2010) (en banc). The Court must conduct its own evaluation of the § 3553(a) factors and may "reject (after due consideration) the advice of the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 113 (2007).

The "overarching provision" of §3553(a) is to impose a sentence sufficient, but not greater than necessary, to meet the goals of sentencing established by Congress. If a sentence other than imprisonment would be sufficient to meet those goals, then the Court must impose such an alternative. Section 3553(a) directs courts to consider, (1) "the nature and circumstances of the offense," (2) "the history and characteristics of the defendant," (3) "the sentencing range established" by the Guidelines; (4) the need for the sentence imposed to reflect the seriousness of the offense, and to deter the criminal conduct, (5) "the need to avoid unwarranted sentence disparities among defendants" nationally; and (6) the "need to provide restitution to any victims of the offense."

II.   **Applying Section 3553(a) Factors:**

   **A.  The History and Characteristics of the Defendant**

     1.  *The first and only offense in Yabrudi's life*

Except for the instances surrounding this case, Yabrudi has lived as an exemplary member of his community during his entire life. Prior to this case Yabrudi only had two driving infractions on his record. He has always maintained employment, cared and provided for his children, and cared for his family. Most importantly, Yabrudi volunteered to work as a Confidential Informant (herein after "CI") for the DEA, putting his life at risk to help the Government identify and capture targets.  Unfortunately, for a brief period, Yabrudi's moral compass failed him, and he let himself be led astray by the very agent that initially recruited him, Co-Conspirator 3 (as identified in the Plea agreement). For that lapse of judgement, he has paid a dear price in the loss of his freedom, loss of his business, damage to his reputation, a lifelong risk to his and his family's safety due to being known as a DEA CI, and most importantly in the shame and disappointment he has brought upon his family, especially his children.

Yabrudi was born in June 1978 in Venezuela to Aura Elena Pena and Teofilo Jose Yabrudi. In 2003, Yabrudi migrated to the United States from Venezuela and lived in the Southern District of Florida. Yabrudi originally worked for his family business, buying merchandise such as clothes and jewelry then shipping it back to Venezuela for resale. Yabrudi then started working in the construction industry and specialized in floor installation. He opened his own construction company and worked in the construction industry until the time of his arrest in 2017.  Except for a short time in his life, Defendant lived an exemplary life and was a model citizen: he learned a trade, held a job, opened his

own company, started a family, and was never in trouble with the law. Unfortunately, that all changed when he was recruited to become a confidential informant for the DEA.

Yabrudi was introduced to Co-Conspirator 3 by a friend at the gym in Miami, Florida, in approximately 2011. During their initial meetings, Co-Conspirator 3 recruited Yabrudi to become a Confidential Informant ("CI") for the DEA. He explained that the DEA needed people like Yabrudi who had a lot of international business contacts. Co-Conspirator 3 explained how Yabrudi could make good money working as a CI and how he would be helping the DEA identify and arrest criminals. Yabrudi accepted the offer and became a CI for the DEA. It should be noted that unlike many CIs who are working time off their sentences or work for the DEA because they were caught doing something illegal, Yabrudi was recruited due to his connections in the South Florida and Venezuela business communities. For years, Yabrudi worked under the direction and supervision of Co-Conspirator 3. Yabrudi became a very effective CI providing high value information leading to many arrest and money seizures. Yabrudi worked with DEA groups in Miami, Boston, and Chicago. Furthermore, Yabrudi was used as a sub-source by DEA groups in Miami (even when not signed up with them) in which he provided valuable information.

Yabrudi's responsibility as a CI included identifying individuals or companies in the United States who would buy dollars and pay the equivalent money in Colombia pesos (the Black-Market Peso Exchange). The dollars that Yabrudi would try to find buyers for was money picked up by DEA off the streets (likely from drug traffickers) and deposited into DEA undercover accounts. Once Yabrudi found a buyer for the dollars, write transfers were then made to the buyers from the DEA accounts; these buyers would then be identified for investigation by the DEA. Co-Conspirator 4 (Co-Conspirator 4 as identified

in the plea agreement) was also a DEA CI who had many contacts and clients who sold dollars in the U.S. and wanted the equivalent in pesos in Colombia. Because Yabrudi's contacts and Co-Conspirator 4's contacts were complimentary, Yabrudi was instructed to work closely with Co-Conspirator 4. In addition, while not working as an official source for Miami DEA Yabrudi would work as a sub-source for Co-Conspirator 4. When working as a sub source, the DEA in Miami instructed Yabrudi to communicate all his action through Co-Conspirator 4 and would even direct Co-Conspirator 4 to share seizure payments with Yabrudi for his work. This arraignment is outside stander operating procedures for DEA and is just another example of how Yabrudi was set up for failure by the very agents who should have been looking out for him. When we see these gray area arrangements being approved by DEA agents, we can begin to understand how it was possible for Yabrudi to have failed to clearly identify what was acceptable and what was not.

Over time Co-Conspirator 3, the agent who recruited Yabrudi and initially handled him, began to ever so slightly push and request actions from Yabrudi that were in a gray area. As in many cases there was never a formal conversation as to performing illegal activity, instead small actions and favors were requested by Co-Conspirator 3 and Co-Conspirator 4 of Yabrudi. Requests were innocuous at first or what might be considered in a gray area, but gradually over time the requests became clearly illegal. Co-Conspirator 3 and 4 would ask Yabrudi to do certain favors for them, like buy gifts, loan them money (which was never repaid), and so on. Eventually, these requests and favors fell clearly outside the law such as the opening of a bank account under someone else's name and advising buyers of dollars to change bank accounts to avoid DEA attention. Unfortunately

for Yabrudi, he failed to refuse and report the illegal requests made by his Co-conspirators. Yabrudi understands that he had a moral and legal duty to know and identify that what was being asked of him was illegal. Yabrudi understands that because he failed to exercise the moral courage required of him and report the activities of Co-Conspirator 3 and Co-Conspirator 4 to other members of the DEA, he finds himself before this Court. However, Yabrudi respectfully requests that this Court consider the incredibly unique and difficult situation he found himself in. As a society we acknowledge the incredible power and influence a person in a position of authority has over a subordinate. *See* Milgram, S. (1963). Behavioral Study of obedience. *The Journal of Abnormal and Social Psychology, 67*(4), 371-378.http://dx.doi.org/10.1037/h0040525 (in this famous Yale study, participants were lead to believe they were administering an electrical shock to another participant. The study found many individuals were willing to administer electrical shocks of significant voltage simply based on the insistence of an experiment monitor wearing a lab coat). It is incredibly difficult to stand up and refuse someone that we believe has legitimate authority, this pressure and power is multiplied tenfold when the individual exercising authority and power is a law enforcement agent with the world's premier drug enforcement agency, the DEA. Someone who uses their badge and gun as a shield to conduct illegal activity is not someone who takes kindly to subordinates deifying them.

From the time of his arrest in this matter, Yabrudi has completely and fully cooperated with the Government in its investigation despite the dangers to him and his families' life. Moreover, Yabrudi has also assisted the Government in obtaining the cooperation of other witnesses in this case. Unlike in other cases where defendants simply state that cooperation may endanger their lives, here Yabrudi has continued to cooperate

even after receiving legitimate death threats on his life via messages sent directly to his wife and to undersigned counsel. Moreover, prior to the previously scheduled sentencing date, Yabrudi's family in Venezuela received funeral wreaths at their home threating Yabrudi's life: yet Yabrudi has been steadfast and unwavering in his commitment to assist the Government with its investigation.  In addition, news stories of this case have made it known that not only is Yabrudi cooperating in this case, but also that he was a longtime DEA CI. *See Relevant News Articles*, attached hereto as Exhibit A. As a result, Yabrudi not only has to worry about danger to his life based on his cooperation in this case, but most also now worry about possible dangers resulting from his years of CI work with the DEA. Furthermore, Yabrudi forfeited property to the DEA following his arrest amounting to approximately $10,300.00. *See DEA Agency Case Number M1-17-0044*.

Lastly, Yabrudi has no prior criminal history and has abided by ever requirement of release in this case for over a year without issue. While Yabrudi' lack of criminal history will be partially taken into account in calculating his advisory guideline range, there is no bar in using it as a basis for a variance.  *See United States v. Chase*, 560 F.3d 828, 831 (8th Cir. 2009). The Eleventh Circuit affirmed the use of this factor, in combination with others, to affirm a downward variance in *United States v. Pugh*, 515 F.3d 1179 (11th Cir. 2008), as have numerous other courts around the country[1].

---

[1] *See, e.g.*, *United States v. Howe*, 543 F.3d 128, 132-33 (3d Cir. 2008); *United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005); *United States v. Marsh*, 820 F. Supp. 2d 320, 360 (S.D.N.Y. 2011); *United States v. Davis*, No. 07 Cr. 727 (HB), 2008 U.S. Dist. LEXIS 44030; 2008 WL 2329290 (S.D.N.Y. June 5, 2008); *United States v. Toback*, No. 01 Cr. 410, 2005 U.S. Dist. LEXIS 6778; 2005 WL 992004 (S.D.N.Y. April 14, 2005).

### 2. Acceptance of Responsibility.

The procedural history of this case is somewhat tortured. Initially, Yabrudi was arrested on January 29, 2018, by Miami-Dade police on money laundering charges resulting for the same events as in this case. Yabrudi was released on bond on February 14, 2018, in that state case. Then Yabrudi was arrested on March 20, 2018, regarding the same charges by DEA-Dallas based on a warrant from the Eastern District of Texas. He was ultimately released on bond on July 12, 2018, Yabrudi has been on restriction and monitoring since July 12, 2018, without incident. The Eastern District of Texas Complaint was ultimately dismissed and Yabrudi was charged based on a waiver of indictment via Information in the Middle District of Florida (the current case). It is important to note that all the aforementioned cases involve the same acts and are not based on separate actions by Yabrudi. From the beginning, Yabrudi has cooperated with the Government. Yabrudi was truthful and provided the Government with any and all information it sought. Yabrudi has participated in approximately nine (9) debrief sessions with the Government and helped secure the cooperation of other witnesses as well as providing physical evidence. While Yabrudi is receiving a reduction for acceptance within the PSR it is still a factor the Court should consider when looking at the totality of the case and defendant.

### B. Nature and Circumstances of the Offense

### 1. Role and details of the offense

Yabrudi has plead and been found guilty of conspiracy to commit money laundering. However, additional details regarding this offense should be brought to the Court's attention prior to sentencing. First, Yabrudi was not the architect or mastermind behind this conspiracy. As detailed above and in the Plea agreement in this case, this

conspiracy involved a multitude of individuals, Co-Conspirators 1 & 2 (as described in the plea agreement) who received dollars in the united states and paid the equivalent pesos in Colombia, Co-Conspirator 3, corrupt DEA agent, and Co-Conspirator 4, a DEA CI, who Yabrudi was made to report and answer to. Yabrudi's role in this conspiracy was minor compared to the other members described above as he was only involved in finding buyers for US dollars. Co-Conspirator 4 was the individual with connections to drug traffickers and narcos who provided the US dollars for sale and wanted the sums paid in Colombian pesos. Co-Conspirator 3 was the individual who assured Yabrudi and Co-Conspirator 4 access to DEA undercover accounts in order to facilitate the transactions. Co-Conspirators 1 and 2 were individuals who purchased US dollars, laundered the funds via their businesses, and paid in pesos in Colombia to the narcos, the actual laundering of money. Yabrudi's role in this conspiracy when compared to the others was minor. He answered to others, he did not manage nor control anyone, and did not perform any of the actual laundering of money. Yabrudi's role was limited to a broker or someone who connected interested parties. The more involved actions taken by Yabrudi regarding the opening of the bank account and directing targets to change bank accounts were at the direction and insistence of Co-conspirator 3 and 4. While these details do not justify or absolve Yabrudi from responsibility for his part in the offense, it does give the Court a more complete picture of Yabrudi' role and culpability in comparison to others. Based on the aforementioned, a variance by the Court in this case is justified.

### 2.  The Arbitrariness of the Loss Table

As previously noted, Yabrudi's Offense Level is largely driven by the estimated loss funds figure—18 of the levels in Yabrudi's advisory guideline were added solely based

on the amount of established by this table. The only other enhancement in § 2B1.1, the section applicable to this case, relates to Yabrudi's knowledge that the laundered funds were connected to drug trafficking, which in this case is applicable, but only because all money was connected to DEA investigations. By contrast, in § 2A, governing violent crimes, there are *no* double-digit enhancements. The only other double-digit enhancements in the Guidelines relate to terrorism.[2] Strapping Yabrudi with a 18-level enhancement for a monetary amount that he did not personally launder is simply unjust and underscores the mistake made by the Sentencing Commission in creating the loss table based on a "policy" decision rather than, as with most other Guidelines, on empirical research. *See United States v. Bonilla*, 618 F.3d 102 (2d Cir. 2010); *United States v. Herink*, No. 10CR169, 2012 U.S. Dist. LEXIS 105549, at *12 (D. Neb. July 30, 2012). This Court would be free to reject the Sentencing Commission's policy choices even if empirically based. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008). The Court should do so and join the chorus of other courts that have found the loss table to be "of no help," *Watt*, 707 F. Supp. 2d at 151, and not a basis for "realistic guidance." *United States v. Parris*, 573 F. Supp. 2d 744, 750-51 (E.D.N.Y. 2008).

Treating a money laundering cases (especially one this peculiar based on the involvement of a corrupt DEA agent) as worse than violent domestic terrorism is not, contrary to the Sentencing Commission, sound sentencing policy. It is therefore not surprising that scholars have recognized that a wooden application of the Guideline in

---

[2] There are 15 level enhancements for trafficking in portable rockets (2K2.1(b)(3)(A) and for boarding air planes with bombs (2K1.5(b)(1)), and there are 12 level enhancements for committing a felony to promote terrorism (3A1.3(a)) and for obstruction of justice related to terrorism (2J1.2(b)(1)(C).

situations like Yabrudi's would produce unjustified, exaggerated sentences.[3] And, as discussed at various points throughout this Memorandum, examples of the judiciary's profound and nearly universal hostility to the Guideline and the excessive sentences it produces abound. The 2016 a study of the judiciary's views on the loss table confirm that the trend steadily increased between 2002 and 2012. *See* Jillian Hewitt, *Fifty Shades of Gray: Sentencing Trends in Major White-Collar Cases*, 125 YALE L. J. 1018 (Feb. 2016). The Department of Justice itself has recognized that the loss Guideline has "lost the respect of a large number of judges" and that these judges have, as a result, been disregarding the Guideline entirely "with increasing frequency."[4] The loss table ignores the differences between violent and non-violent crimes, the kind of person each defendant is, and is a "relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D. N.Y. 2004).

---

[3] *See, e.g.*, Derick R. Vollrath, *Losing The Loss Calculation: Toward A More Just Sentencing Regime In White-Collar Criminal Cases*, 59 DUKE L.J. 1001, 1020 (2009) ("The sentencing of federal white-collar criminal defendants is deeply flawed. The guidelines recommend sentences that are generally too harsh. Moreover, the guidelines place undue emphasis on the loss calculation, and imprecise measure that fails to accurately correlate with the defendant's culpability."); Paul J. Hofer & Mark H. Allenbaugh, *The Reason Behind the Rules*, 40 AM. CRIM. L. REV. 19, 70-71 (Winter 2003) (stating that even certain Commissioners have noted the "false precision" of the monetary loss guidelines) (citation omitted); Jeffrey S. Parker & Michael K. Block, *The Limits of Federal Criminal Sentencing Policy; Or, Confessions of Two Reformed Reformers*, 9 Geo. Mason Law Rev. 1001, 1053-54 (2001) (criticizing the guideline loss table's "gratuitous increases in punishment levels," and noting the absence of any empirical research to support the loss tables).

[4] June 28, 2010 letter to Hon. William K. Sessions II, Chair of the Sentencing Commission from Jonathan Wrobleski, Director, Office of Policy and Legislation, pp. 2, 4.

### 3. The amount established by the Loss table in this case Overstates the Seriousness of the Actual Loss.

Yabrudi does not object to the Court using the loss table as the measure of laundered money for purposes of calculating his advisory Guideline range. Nor does he seek or intend there to be an evidentiary hearing on any aspect of loss. However, he does believe that loss table overstates the harm in this case—a fact that the Court should consider in determining a fair and just sentence in this case.

The loss figure *assumes* that every single dollar was laundered by Yabrudi, when in fact, Yabrudi was a small cog in a large machine which laundered these funds. The estimated $7 million in this case were all picked up by DEA off American streets with information provided by Co-conspirator 4, and other CIs like him, who had connections with drug traffickers. After this money was picked up off the streets in cash, it was deposited into DEA accounts at which point CIs like Yabrudi were instructed to find buyers for the dollars. Yabrudi would reach out to his network and inquire if anyone was interested in buying the dollars and paying them back in pesos. When buyers were located, Yabrudi would pass along their account information to DEA agents to make the wire transfers. The actual trade-based money laundering involving the buying of goods, shipping them, and selling them internationally was done by individuals like Co-Conspirator 1 and 2, not Yabrudi. In this case, Yabrudi's "loss" amount was calculated based on the money that entered the fraudulent account he created at Co-Conspirator 3's request and because he advised Co-Conspirator 1 to change his bank accounts, again at Co-Conspirator 3 and 4's request. The intended loss figure was not based on an examination of the dollars that

Yabrudi himself laundered. Based on the foregoing, Yabrudi is deserving of a downward variance.

### 4. The Specific Offense Characteristic pursuant to USSG §2S1.1(b)(1) which enhances six (6) levels does not accurately reflect the circumstances of this case.

As above, Yabrudi does not object to the Court applying the USSG §2S1.1(b)(1) enhancement for purposes of calculating his advisory Guideline range. Nor does he seek or intend there to be an evidentiary hearing on this enhancement. However, he does believe that the enhancement does not accurately reflect the circumstance in this case—a fact that the Court should consider in determining a fair and just sentence in this case.

USSG §2S1.1(b)(1) provides for a six (6) level enhancement when the defendant knew or believed that any of the laundered funds were the proceeds of or were intended to promote and offense involving the manufacture, importation, or distribution of a controlled substance. Here it is part of the plea agreement that Yabrudi admits to having knowledge that the laundered funds related to drug trafficking. However, this case is different from others in that Yabrudi was working with the DEA and knew that these funds were being monitored by said agency. Clearly the DEA's focus is drug trafficking so there is no other connection this money would have. However, as explained above, Yabrudi did not have connections with drug traffickers or narcos, his connections were with individuals and businesses that bought dollars and used them to purchase merchandise like electronics. In this case, Co-Conspirator 3 and 4 were the individuals who had connections with drug traffickers and new exactly where the money was coming from and where it was heading. Based on the foregoing, Yabrudi believes the Court is well within its discretion to grant a variance below the currently sentencing guideline range.

### C. Respect for the Law and Just Punishment

#### 1. Respect for the law

The Supreme Court recognized in *Gall* that fashioning a sentence "to promote respect for the law" does not invariably point towards harsher sentences. Referring to the "unique facts of Gall's situation," which included his voluntary rehabilitation, the Court agreed that "a sentence of imprisonment may work to promote not respect, but derision, of the law, if the law is viewed merely as a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall v. United States*, 552 U.S. 38, 54 (2007). That would be true here as well.

#### 2. Just punishment and collateral consequences

In this case, Yabrudi has served approximately one hundred and thirty (130) days behind bars (approximately 4 months). However, the conditions in which he spent those four (4) months bares significant consideration by the Court as it was time served under difficult conditions. Yabrudi was transported from Florida to Georgia under custody, then to Oklahoma, and finally to Texas; a process involves countless hours shackled in place on aircrafts, buses, and transfer facilities. This transportation trips were tortures especially given Yabrudi's medical history of ulcerative colitis which flairs up due to stress. In Texas, Yabrudi was housed in a "tank" which housed eight (8) inmates in close quarters and provided them with only two (2) hours a week outside of their cell. Yabrudi was separated from all friends and family during this time as he knew no one in Texas. As a result of his incarceration, Yabrudi's floor installation business collapsed and his family faced dire financial pressure.

Lastly, Yabrudi has been on conditional release for over one (1) year, he has been under electronic monitoring and has had a curfew which he has abided by during said time. Furthermore, as a condition of his release Yabrudi was forced to move his entire family to another state and out of Florida due to the security concerns related to his cooperation. Yabrudi and his family have had to leave the only place they have ever known and start over as a result of this case. These is also a form of punishment which Yabrudi has endured as a result of this case because his freedom has been restricted and his ability to choose were to live has been made for him.

Numerous courts have recognized that the collateral consequences of a conviction can be nearly as harsh, and far more permanent, than even a short prison term[5]. Yabrudi has already suffered various collateral consequences as a result of this case. He lost his company which he had been building for years, he has been affected economically and had to rely on the kindness of his family to survive, and he has suffered the public shaming of having people in his community and professional circles learn of his arrest and now conviction. Furthermore, Yabrudi will live the rest of his life looking over his shoulder as a result of the cooperation in this case and due to the public knowledge, that was a DEA CI. *See Exhibit A.*

With Yabrudi' financial hardship, the abrupt end of his professional career and the destruction of an unblemished reputation, having already served four (4) months in prison,

---

[5] *See, e.g., United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where defendant was punished by the loss of his business); *United States v. Samaras*, 390 F. Supp. 805, 809 (E.D. Wis. 2005) (granting variance in part because defendant lost a good public sector job as a result of his conviction). *Cf. United States v. Coughlin*, No. 06-20005 (W.D. Ark. February 1, 2008), 2008 U.S. Dist. LEXIS 11263, at **21-27 (for white collar crime, probation and home detention more effectively accomplish the goals of § 3553(a)(2) than imprisonment).

and over a year of restricted freedom, sentencing Yabrudi to additional jail time would be unnecessary for the justice system to provide just punishment. *See United States v. Vigil*, 476 F. Supp. 2d 1231, 1235 (D. N.M. 2007) (finding variance appropriate where defendant was collaterally punished by the loss of his position and reputation, widespread media coverage, and emotional toll of two lengthy trials). Yabrudi has already and will continue to be "justly punished" for this case without the need for additional prison time. Hence, a downward variance is justified in this case.

**D.      Deterrence and Protection of the public.**

This factor "unquestionably envisions more severe sentences for defendants considered more likely to commit further crimes and less severe sentences for those unlikely to commit crimes." *United States v. Rodriguez*, 724 F. Supp. 1118, 1120 (S.D.N.Y. 1989). Yabrudi is forty-one (41) years old, is a first-time offender, has a profession (floor installer), and has a family including two (2) small children and one (1) adult child. Based on his age, education, and criminal history category alone, Yabrudi has a statistically low risk of recidivism. In imposing a sentence sufficient, but not greater than necessary, to accomplish the goals of sentencing—deterrence, protecting the public, and promoting respect for the law—the Court should, as a threshold matter, consider the statistically low risk of recidivism presented by Yabrudi's history and personal characteristics. *See, e.g., United States v. Clay*, 583 F.3d 739 (11th Cir. 2007) (affirming variance from 188-235 to 60 months imprisonment due to finding that the defendant was not likely to re-offend). In a similar case, much lower sentences have often been approved. *See e.g., United States v. Hochrek*, No. 09-CR-118, 2011 U.S. Dist. LEXIS 71035, at *9 (E.D. Wis. June 30, 2011) (defendant convicted of mortgage fraud with a Guideline range of 46-57 months sentenced

to a one year split sentence of 6 months in prison and 6 months home confinement, in part, because "given [the defendant's] age [50] and lack of any prior record, defendant did not pose a threat to the public").

In upholding a deviation from the Guidelines where a district court-imposed probation instead of jail time, the Supreme Court in *Gall* recognized that "[o]ffenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty." *Gall*, 552 U.S. at 48 (listing restrictions imposed on probationers, and quoting the Advisory Council of Judges of National Council on Crime and Delinquency, Guides for Sentencing 13-14 (1957) ("Probation is not granted out of a spirit of leniency…probation is not merely letting an offender off easily" (internal citations omitted)); *see also Coughlin*, 2008 U.S. Dist. LEXIS 11263, at *22 ("Home detention and probation can be severe punishments, hugely restrictive of liberty, highly effective in the determent of crime and amply retributive"). For many, these penalties are as damaging as a custodial sentence and achieve the goals of Section 3553(a)(2). *See Id*. at *27 ("the severely punitive quality of probation [is] capable of deterring corporate executives" from engaging in similar conduct again). In *United States v. Musgrave*, 647 Fed. Appx. 529 (6th Cir. 2016), the defendant, a certified public accountant, was convicted of a $1.7 million scheme to defraud the Small Business Administration and a bank. The court approved a variance down from a Guideline range of 57-71 months imprisonment to a sentence of one day of imprisonment with credit for the day of processing, five years of supervised release with 24 months of home confinement, a fine of $250,000 and payment of $1.7 million in restitution. The court did so based on Musgrave's history as a successful businessman and employer, his extensive work in the community, support from family and friends, lack of

criminal history, and promised payment of restitution. In this case, a split sentence of eighteen (18) months with half home confinement and a period of supervised release would be appropriate and meet the goals of Section 3553(a).

**E.     Sentencing range produced by the Guideline**

Under the current PSR, the advisory guideline recommends a sentence between 87-108 months. The Government has also filed a 5K motion requesting a two (2) level reduction based on Yabrudi's cooperation thus far. This would result in an offense level of 27 and a recommended range between 70-87 months. Lastly, if the Court accepts Defendant's argument on a minor role reduction for Yabrudi, the advisory base offense level would be a 25 with guideline recommendation of between 57-71 months.

In this case, Yabrudi has already served four (4) months of prison time under significantly difficult conditions. Moreover, he has also lived over one (1) year under restricted liberty with a curfew and electronic monitoring. The disruption that a sentence requiring significant prison time would cause to Yabrudi, his family, and his children does not serve the ends of justice. Specifically, Yabrudi's two minor children have been significantly affected by this case after seeing their father arrested in the middle of the night, having to leave everything they ever knew, and move to another state. Yabrudi's life is solely committed to work and family.  Yabrudi has paid dearly for his crime and further prison time would be unnecessary to assure adequate punishment in this case. For said reasons, we respectfully request a sentence variance below the guideline range.

**F.     <u>Sentencing Disparities and the Extent of the Variance</u>.**

Most courts consider that this factor looks to "national" disparities between defendants with similar records who have been found guilty of similar conduct—not

disparities between codefendants. *See United States v. Conatser*, 514 F.3d 508, 521 (6th Cir. 2008); *United States v. Parker*, 462 F.3d 273 (3d Cir. 2006). Based on national statistics, individuals sentenced under USSC §2B1.1 (as in this case) have historically received an average sentence of approximately twenty-four (24) months. This data covers a span of approximately nine (9) years:



**Figure E-4**

**SENTENCE LENGTH OF ECONOMIC OFFENSE OFFENDERS OVER TIME[1]**
**Fiscal Years 2009 - 2018**

[1] Only offenders sentenced under §§2B1.1 (Theft, Property Destruction, and Fraud Offenses), 2B3.1 (Robbery), 2B4.1 (Bribery), 2B5.1 (Counterfeiting), or 2B5.3 (Copyright) are depicted in this figure. Sentences of 470 months or greater (including life) and probation were included in the sentence average computations as 470 months and zero months, respectively. The information in this figure includes time of confinement as described in USSG §5C1.1. Cases missing sentencing information were also excluded. Descriptions of variables used in this figure are provided in Appendix A.

SOURCE: U.S. Sentencing Commission, 2009 - 2018 Datafiles, USSCFY09 - USSCFY18.

USSC, 2009-2018 Datafiles, USSCFY09-USSCFY18. However, Yabrudi currently has a sentencing guideline recommendation of 87-108 months. This is a sentence of approximately 63 additional months over the average, assuming he were to receive a low-end score.

When we look more specifically at money laundering cases, we see that the national and 11th Circuit statistics are also well below the sentence currently recommended for Yabrudi:

**Table 7**

**LENGTH OF IMPRISONMENT BY PRIMARY OFFENSE CATEGORY**
**Fiscal Year 2017**

| PRIMARY OFFENSE | National | | | Eleventh Circuit | | |
|---|---|---|---|---|---|---|
| | Mean Months | Median Months | N | Mean Months | Median Months | N |
| TOTAL | 51 | 27 | 58,091 | 66 | 40 | 5,537 |
| Murder | 224 | 180 | 72 | -- | -- | 1 |
| Manslaughter | 71 | 60 | 59 | -- | -- | 0 |
| Kidnapping/Hostage Taking | 230 | 210 | 62 | -- | -- | 2 |
| Sexual Abuse | 140 | 120 | 632 | 157 | 120 | 85 |
| Assault | 35 | 24 | 632 | 59 | 30 | 27 |
| Robbery | 77 | 60 | 620 | 72 | 57 | 65 |
| Arson | 67 | 60 | 37 | 60 | 60 | 3 |
| Drugs - Trafficking | 75 | 60 | 17,795 | 88 | 75 | 1,900 |
| Drugs - Communication Facility | 38 | 37 | 190 | 38 | 30 | 38 |
| Drugs - Simple Possession | 5 | 6 | 957 | 4 | 3 | 6 |
| Firearms | 75 | 52 | 7,590 | 90 | 60 | 940 |
| Burglary/B&E | 20 | 18 | 29 | 23 | 24 | 3 |
| Auto Theft | 88 | 57 | 52 | 104 | 108 | 3 |
| Larceny | 20 | 12 | 365 | 24 | 18 | 69 |
| Fraud | 35 | 24 | 4,471 | 36 | 27 | 922 |
| Embezzlement | 15 | 11 | 164 | 21 | 12 | 26 |
| Forgery/Counterfeiting | 21 | 18 | 287 | 19 | 15 | 49 |
| Bribery | 25 | 18 | 114 | 23 | 18 | 16 |
| Tax | 19 | 12 | 263 | 20 | 15 | 12 |
| Money Laundering | 44 | 30 | 497 | 45 | 37 | 62 |
| Racketeering/Extortion | 108 | 60 | 866 | 111 | 60 | 45 |
| Gambling/Lottery | 9 | 5 | 12 | -- | -- | 0 |
| Civil Rights | 60 | 27 | 33 | 38 | 30 | 4 |
| Immigration | 13 | 10 | 18,475 | 11 | 6 | 858 |
| Child Pornography | 151 | 97 | 1,763 | 192 | 120 | 169 |
| Prison Offenses | 12 | 11 | 492 | 9 | 6 | 39 |
| Administration of Justice Offenses | 25 | 18 | 770 | 23 | 21 | 92 |
| Environmental/Wildlife | 12 | 6 | 18 | 4 | 3 | 3 |
| National Defense | 63 | 35 | 78 | 86 | 38 | 9 |
| Antitrust | 24 | 12 | 13 | -- | -- | 0 |
| Food & Drug | 20 | 12 | 23 | 27 | 17 | 6 |
| Other Miscellaneous Offenses | 41 | 12 | 660 | 52 | 18 | 83 |

Of the 66,873 guideline cases, 8,782 cases were excluded for one or both of the following reasons:  zero months of prison ordered (8,345), or missing or indeterminable sentencing information (437).

Of the 6,542 guideline cases from the Eleventh Circuit, 1,005 cases were excluded due to one of the following reasons:  zero months of prison ordered (897) or missing or indeterminable sentencing information (108).

SOURCE:  U.S. Sentencing Commission, 2017 Datafile, USSCFY17.

United States Sentencing Commission, *Statistical Information Packet, Fiscal Year 2017, Eleventh Circuit*, at p. 10. As can be seek above, the average sentence for money laundering cases Nationally is 30 months; while the average for the 11th Circuit is 37 months. However, these numbers are skewed upward because cases in which no prison time was required are not included in the average. In this case, Yabrudi's recommended sentence is

well above the national and circuit average. For these reasons, Yabrudi should receive a downward variance from the Court.

## **CONCLUSION**

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate ... the crime and the punishment to ensue." *Koon*, 518 U.S. at 113. In this case, basing a sentence on the rigid following of the Sentencing Guideline would underscore the "travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense." *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006)), aff'd, 301 Fed. Appx. 93 (2d Cir. 2008). For these reasons set forth above, we respectfully request a sentence sentence which does not involve further imprisonment.

Dated: July 23, 2019                                     Respectfully submitted,

                                                         /s/ Leonardo E. Concepcion
                                                         Leonardo E. Concepcion, Esq.
                                                         Concepcion Law
                                                         6405 NW 36 Street,
                                                         Suite 210A
                                                         Virginia Gardens, Florida, 33146
                                                         Telephone: (305) 791-6529
                                                         Email: LC@Lconcepcionlaw.com

## **CERTIFICATE OF SERVICE**

I certify that on July 23, 2019, my office electronically filed the foregoing with the Clerk of Court using the CM/ECF. I also certify that this document is being served on all counsel of record either by transmission of Notices of Electronic Filing generated by CM/ECF.

                                                         /s/ Leonardo E. Concepcion
                                                         FL Bar No.: 0106317